**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**


CINDY BURDETTE

                    Plaintiff,

vs.                                                      CASE NO: 2:06-cv-138-FtM-33SPC

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.
_____


## <u>REPORT AND RECOMMENDATION</u>[1]

_____This matter comes before the Court on the Plaintiff, Cindy Burdette's, Complaint Seeking

Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the

Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on March 16, 2006, in the Middle District

of Florida, Fort Myers Division.  The Plaintiff filed her Memorandum of Law in Support of the

Complaint (Doc. #15) on September 5, 2006.  The Commissioner filed the Memorandum of Law in

Support of the Commissioner's Decision (Doc. #16) on October 3, 2006.  On December 11, 2006,

the Commissioner filed a Motion to Remand (Doc. #19) pursuant to Sentence Six.  The District

Court granted the Motion and remanded the case to the Commissioner to remove medical records

not belonging to the claimant and for another administrative hearing.  <u>See</u> Order Doc. #20.  As a

result, the case was administratively closed.

_____

[1]This Report and Recommendation addresses only the issues brought up for
review by the District Court pursuant to 28 U.S.C. § 405(g).

On January 16, 2009, the Commissioner filed a Motion to Reopen the Case (Doc. #23) and the Court granted the Motion. The Plaintiff filed her Memorandum in Opposition to the Commissioner's Decision (Doc. #29) on September 16, 2009. The Commissioner filed the Memorandum of Law in Support of the Commissioner's Decision (Doc. #30) on October 14, 2009. Thus, the Motion is now ripe for review.

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

## FACTS

### *Procedural History*

The Plaintiff previously filed an application for a period of disability and disability insurance benefits on September 24, 2003, alleging an onset disability date of June 18, 1997. (Tr. 88, 347). The Plaintiff's application was denied initially on February 5, 2004, and upon reconsideration on May 5, 2004. (Tr. 81-84, 76-78, Pl. Brief Doc. #29, p.1). The Plaintiff filed a Request for Hearing on June 7, 2004. (Tr. 79A). A hearing was held before the Honorable Richard E. Ouellette, Administrative Law Judge (ALJ) on September 8, 2005. (Tr. 26-56). The ALJ issued an unfavorable decision on November 26, 2005. (Tr. 13-25). The Plaintiff filed a Request for Review by the Appeals Council on December 18, 2005. (Tr. 7). The Appeals Council denied Plaintiff's request. The Plaintiff had exhausted her administrative remedies, and a Complaint was filed with this Court on March 16, 2006. Subsequently, the parties filed their respective memoranda of law. On November 14, 2006, the Court entered an Order directing the Commissioner to show cause as to why the case should not be remanded to determine whether the ALJ used the medical records of

an individual named Elsie Rodriguez, which were contained in the file, instead of the those belonging to the claimant, to make his disability determination. See Order Doc. #16. On December 11, 2009, the Defendant filed the Motion to Remand pursuant to sentence six of 42 U.S.C. §405(g). A Notice of Order of Appeals Council Remanding Case to Administrative Law Judge was entered on January 10, 2007, and the Appeals Council vacated the final decision of the Commissioner, and remanded the case to an Administrative Law Judge for further proceedings. (Tr. 378-380).

On remand, a second hearing was held before ALJ Richard Ouellette on March 19, 2008. (Tr. 513-536). At the second hearing, the Plaintiff amended her application to a closed period of disability, beginning with the application date of her SSI claim, September 24, 2003, and ending March 20, 2007. (Tr. 516). The ALJ explained in his decision that the amendment was necessary due to the existence of work experience in 2003, and a lack of medical evidence from four (4) years after the alleged onset date until October 2003. (Tr. 356-357). As a result, Counsel stipulated to the amended closed period of disability. (Tr. 357). Upon consideration of the evidence and testimony from the hearing, the ALJ issued an unfavorable decision dated June 20, 2008. (Tr. 353-367).

On January 16, 2009, the Defendant moved the Court to reopen the case and accept the corrected transcript. See Doc. #23. The Court granted the Motion, reopened the case and removed the administrative closure flag. The Plaintiff filed her Memorandum of Law (Doc. #29) on September 16, 2009, and the Defendant filed their Memorandum of Law (Doc. #30), on October 14, 2009. Thus, the case is ripe for review under 42 U.S.C. § 405(g).

### *Plaintiff's History*

The Plaintiff was born December 22, 1961. (Tr. 88). The Plaintiff was forty-three (43) years old on the date of her first Administrative Law Judge hearing (Tr. 30) and forty-six (46) years old

at the second hearing. (Tr. 519). The Plaintiff completed high school and has an Associate's Degree in business administration. (Tr. 30). The Plaintiff's past relevant work experience includes work as a secretary, an art gallery manager, a custom framer in a craft store, owner of a car lot, and a retail sales clerk in a department store. (Tr. 93, 149). The Plaintiff last worked June 16, 1997. The Plaintiff alleges a closed period of disability beginning September 24, 2003 through March 20, 2007, due to hepatitis, liver inflammation, joint pain, fatigue, depression and anxiety attacks. (Tr. 96, 104, 158-160).

## *Medical History*

The Plaintiff adopts the Statement of Facts as set forth in her original brief with the exception that on remand, the Plaintiff amended her request for disability benefits for a closed period of time for SSI benefits only, from September 24, 2003, to March 20, 2007. (Tr 357). Furthermore, the present Statement of Facts includes additional medical evidence which transpired between the first and second hearings.

Early medical records from December 2002 to October 2003, reflect the Plaintiff was treated by Beverly Mesch, MS, Acupuncture Physician for symptoms related to her Hepatitis C, which included, fatigue, weakness, nausea, aching joints, pain, swelling of liver, intermittent fever, night sweats, depression, and impaired concentration. (Tr. 203).

The Plaintiff's Hepatitis C had originally been diagnosed in 1993, but was not initially treated with conventional medicine. She presented to Dr. Brent Myers in 2004, complaining of numerous symptoms including severe fatigue and recent weight loss. She reported a 1977 blood transfusion as the origin of the Hepatitis and denied IV drug use. She was neither a smoker nor alcohol drinker. (Tr. 307).

On May 19, 2004, the Plaintiff underwent a complete abdominal ultrasound which demonstrated coarse liver texture consistent with liver disease. (Tr. 305). The Plaintiff was scheduled for a liver biopsy and was to follow-up to discuss treatment. (Tr. 292). The Plaintiff underwent the liver biopsy on October 14, 2004. (Tr. 288). The test demonstrated Grade 2, Stage 2, Hepatitis C. (Tr. 287). The Plaintiff was placed on PEG-Intron treatment for 12 months. (Tr. 287). After eight (8) weeks, the Plaintiff presented for follow-up on December 22, 2004, reporting depression and insomnia. She was prescribed Restoril for insomnia and Celexa for depression. (Tr. 284).

On January 6, 2005, the Plaintiff reported feeling very anxious as a side effect from the Celexa and was switched to Elavil. (Tr. 283). After fifteen (15) weeks of the PEG-lntron Ribavirin combination, Plaintiff developed anemia. She was unable to tolerate the Elavil and was switched back to Celexa. (Tr. 280).

The Plaintiff's PEG-Intron treatment continued. After six (6) months, Dr. Myers reported the Plaintiff as tolerating the medication with no significant side effects. (Tr. 324). After nine (9) months, Dr. Myers noted the Plaintiff was troubled by depression. Dr. Myers continued the medication at the present dosage as she continued to respond to the PEGIntron/Ribavirin combination. (Tr. 512). After 10 months, on September 6, 2005, Dr. Myers reported the Plaintiff developed severe psychiatric side effects of depression, confusion, and psychosis with the PEG-lntron. As a result, Dr. Myers recommended stopping the PEG-lntron/Ribavirin combination and to follow-up with her psychiatrist. (Tr. 511).

The Plaintiff returned to Dr. Myers on March 15, 2006, with complaints of right upper quadrant abdominal pain. The abdominal ultrasound was unremarkable and further testing was

recommended. (Tr. 510). By May 2006, the Plaintiff sustained viral response to the therapy and was considered by Dr. Myers to be a successful treatment. (Tr. 509).

The Plaintiff received mental health treatment at Ruth Cooper Center from September 2004 through May 2006. (Tr. 418-455). The Plaintiff was diagnosed with anxiety and depression characterized by poor sleep and panic disorder, depressive disorder due to a medical condition, rule out generalized anxiety disorder. (Tr. 266-279; 326-330; 336-346). The Plaintiff was treated with Xanax and Zoloft for depression due to her medical condition. Treatment was justified because without routine medical visits to ensure compliance and appropriate intervention, it was determined the Plaintiff would show, or has in the past shown, significant cognitive, emotional, behavioral deterioration. (Tr. 266-279A). Other medications prescribed included Celexa and Elavil. (Tr.266). Dr. Santiero, the Plaintiff's treating psychiatrist at Ruth Cooper Center, noted Plaintiff's symptoms of depression included disturbed sleep, anhedonia, decreased energy and motivation and decreased concentration. (Tr. 276). Ongoing treatment at Ruth Cooper Center continued and Plaintiff was assessed with a diagnosis of depressive disorder due to medical condition, rule out generalized anxiety disorder under Axis 1. (Tr. 328-330). Active symptoms and problems identified on September 6, 2005, were continuing depression as she neared one (1) year of treatment with Interferon. The Plaintiff was prescribed Lexapro and Xanax by Dr. Bonstedt, her psychiatrist at the Ruth Cooper Center. (Tr. 398). Additional problems reported were memory and drowsiness, and problems with medication combinations. (Tr. 419). On September 28, 2005, the Plaintiff reported to the psychiatrist that she had to discontinue the Interferon treatment because of its effect on her depression. (Tr.421). The Plaintiff followed up on March 29, 2006, with an improved mood, having stopped taking Lexapro and continuing with Xanax for anxiety. Her diagnosis was depressive

disorder due to a medical condition, in remission, generalized anxiety disorder, controlled with medication. (Tr. 423).

In April 2006, Plaintiff was admitted to the crisis unit at Ruth Cooper Center. Earlier that month, her sister was killed, she had run out of her Xanax, and was unable to afford continuing her Lexapro. (Tr. 429). In April 22, 2006, the police were summoned to her home due to a domestic dispute between her and her ex-husband and she was admitted to the crisis stabilization unit (CSU) under the Baker Act after voicing suicide ideation. (Tr. 431). Her treatment over the past few years was noted to include history of panic attacks, including palpitations, shortness of breath, chest tightness, abdominal discomfort, paresthesias, nausea, trembling, sweating, feeling unsteady, fainting or dizzy/lightheaded, and fears of losing control, excessive worry and difficulty concentrating, as well as muscle tension. (Tr 431).

The Plaintiff complained of chronic neck and back pain. She had a work-up for an unknown gastrointestinal illness, with symptoms not inconsistent with anxiety, but possibly due to an underlying organic condition. The Plaintiff's Hepatitis C was noted, contracted after undergoing transfusion in 1977 and again in 1985. (Tr. 431). She was stabilized and released for regularly scheduled psychotherapy and medication management. (Tr. 433).

The Plaintiff was evaluated at the request of the Office of Disability Determinations by Paul J Miske, Ph D., a licensed clinical psychologist, who conducted a psychodiagnostic evaluation on January 12, 2004. (Tr. 209). The Plaintiff presented with a history of being unable to work as of September 2003, due to a "constellation of symptoms consistent with the diagnosis of clinical depression" (Tr. 209). The symptoms included episodes of uncontrolled crying, feelings of helplessness, impaired sleeping and eating as well as social isolation. (Tr. 209). Dr. Miske opined

Plaintiff has moderate impairments in attention, concentration and short-term recall during the examination process. Dr. Miske states these deficiencies could have explained Plaintiff's alleged inability to function in a work environment. Although functional with her activities of daily living, she admitted to being socially isolated and having few hobbies. (Tr. 210). Dr Miske's diagnostic impression was Major Depressive Disorder, recurrent, without Psychotic Features, pursuant to the DSM~IV diagnostic criteria for 296 33 Major Depressive Disorder, Recurrent, without Psychotic Features. (Tr. 210). The prognosis was contingent on her being able to afford psychotropic medications which was recommended that Plaintiff seek as soon as possible. (Tr. 210).

State Agency consultants reviewed the Plaintiff's mental status and found the Plaintiff to be moderately limited in maintaining concentration, persistence, or pace, understanding and carrying out instructions; completing a normal weekday, and responding appropriately to changes in the work setting. (Tr. 224, 228, 229, 248, 249). For 10 months, the Plaintiff received PEG-Intron to treat her Hepatitis, which caused severe psychiatric side effects. As a result, Plaintiff's treatment was stopped.

*Administrative Law Judge's Decision*

Upon consideration of the record, the ALJ found Plaintiff has not been under a disability within the meaning of the Social Security Act since September 24, 2003, the date the application was filed. (Tr. 357). The ALJ found the Plaintiff engaged in substantial gainful activity ("SGA") since September 24, 2003. (20 CFR 416.920(b) and 416.971 *et seq*.). (Tr. 359). The ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). (Tr. 360). After careful consideration of the entire record, the ALJ concluded the Plaintiff

had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) between September 24, 2003 and October 2007, except that she has an occasional limitation for unusual postures (stooping, crouching, crawling, kneeling) but could perform routine work occupations in an air conditioned environment. (Tr. 361). Thus, the ALJ found the Plaintiff was able to perform past relevant work from September 24, 2003 to April 2007 (20 CFR 416.965). (Tr. 365). The Plaintiff was born on December 22, 1961, and was 43 - 45 years old, which is defined as a younger individual, on the date the application was filed. (20 CFR 416.963). (Tr. 365). The Plaintiff possesses a high school education and is able to communicate in English. (20 CFR 416.964). (Tr. 365). The ALJ found transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that the Plaintiff is "not disabled". (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). (Tr. 365). The ALJ, considering the Plaintiff's age, education, work experience, and residual functional capacity, found there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed from September 24, 2003 through April 2007. (20 CFR 416.960(c) abd 416.966). (Tr. 365-366). Therefore, the ALJ concluded the Plaintiff has not been under a disability, as defined in the Social Security Act, since September 24, 2003, the date the application was filed. (20 CFR 416.920(g)). (Tr. 367).

## THE STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, and whether the findings are supported by substantial evidence. Hibbard v. Commissioner, WL 4365647 *2 (M.D. Fla. December 12, 2007) (citing Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971); McRoberts v. Bowen, 841 F. 2d 1077, 1080

(11th Cir. 1988)). In evaluating whether a claimant is disabled, the ALJ must follow the sequential inquiry described in the regulations[2]. 20 C.F.R. §§ 404.1520(a), 404.920(a). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion." Hibbard, WL 4365647 *2 (citing Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); Richardson, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Phillips v. Barnhart, 357 F. 3d 1232, 1240 n. 8 (11th Cir. 2004). The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding the court must

---

[2]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability. The steps are as follows:
*Step 1.* Is the claimant engaged in substantial gainful activity? If the claimant is engaged in such activity, then he or she is not disabled. If not, then the ALJ must move on to the next question.
*Step 2.* Does the claimant suffer from a severe impairment? If not, then the claimant is not disabled. If there is a severe impairment, the ALJ moves on to step three.
*Step 3.* Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, then the claimant is disabled. If not, the next question must be resolved.
*Step 4.* Can the claimant perform his or her former work? If the claimant can perform his or her past relevant work, he or she is not disabled. If not, the ALJ must answer the last question.
*Step 5.* Can he or she engage in other work of the sort found in the national economy? If so, then the claimant is not disabled. If the claimant cannot engage in other work, then he or she is disabled. See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, re-weigh the evidence or substitute it's judgment for that of the [Commissioner]."Phillips, 357 F. 3d at 1240 n. 8; Dyer v. Barnhart, 357 F. 3d 1206, 1210 (11th Cir. 2005).  If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).2

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Williams v. Commissioner, 407 F. Supp. 2d 1297, 1299-1300 (M.D. Fla. 2005) (citing Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994)); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).

## DISCUSSION

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

The Plaintiff argues the ALJ erred as follows: (1) failed to afford the proper weight to the Plaintiff's treating physicians and failed to find a mental impairment as a result; and (2) failed to consider the side effects of the Plaintiff's Interferon therapy; (3) failed to properly assess the

Plaintiff's credibility and to apply the Eleventh Circuit's Pain Standard.  The Commissioner argues the ALJ made the proper RFC assessment and substantial evidence supports the decision of ALJ.

### *Whether the ALJ Afforded the Proper Weight to the Plaintiff's Treating Physicians and Mental Health Professionals*

The Plaintiff argues the ALJ failed to accord the appropriate weight to the Plaintiff's treating source, Dr. Brent Myers, and her mental health providers.  See Pl. Brief, Doc. #29, p. 9.  The Plaintiff first argues the ALJ erred in failing to discuss the treatment records of Dr. Myers, who treated the Plaintiff for Hepatitis beginning on May 17, 2004.  (Tr. 18).  The Plaintiff also argues the ALJ erred by not finding mental limitations.  The Defendant argues the ALJ properly considered the medical evidence provided by Dr. Myers and provided sufficient discussion in his analysis. Further, the Defendant argues the ALJ properly considered the medical evaluations and records of the Plaintiff's treating psychiatrists and thus, substantial evidence supports the ALJ's decision.

Although the ALJ considered additional evidence submitted after remand, in his second decision, the ALJ noted the remand was essentially procedural, rather than as a result of an error of law.  The ALJ stated that the Court's remand was not based upon a failed ALJ's conclusion.  Thus, the ALJ did not find reason to revise his initial analysis and points to his initial decision regarding the Plaintiff's treating sources and re-evaluates the medical records within the amended timeframe of September 24, 2003 through April 2007.  (Tr. 361).

In the ALJ's initial decision, the ALJ discussed on May 17, 2004, the Plaintiff began treatment with Dr. Brent Myers, a board certified gastroenterologist, for heartburn and belching.  (Tr. 18, 307-308).  Upon examination, Dr. Myers opined Plaintiff had Hepatitis C and had not been treated other than holistically.  (Tr. 307). The Plaintiff complained of severe fatigue, frequent

heartburn, excessive belching and arthralgias. (Tr. 307). Physical examination revealed an unremarkable head and neck exam, and no lesion or lymphadenopathy. (Tr. 18, 308). Plaintiff's musculoskeletal, neurological, and psychiatric examinations were normal. (Tr. 18, 208). Dr. Myers ordered an esophagogastroduodenoscopy, an abdominal ultrasound, blood work and directed the Plaintiff to return for follow up in August 2004. (Tr. 307).

Upon review of the diagnostic testing, the ultrasound showed the liver was mildly coarsened in echotexture consistent with liver disease. (Tr. 8-19, 305). Dr. Myers ordered a liver biopsy which showed grade 2, stage 2, Hepatitis C. (Tr. 19, 287). At that time, the Plaintiff began PEG Intron 80 mcg SQ weekly for 12 months, and was placed on Ribavirin 400 mg. (Tr. 19, 287).

On December 22, 2004, the Plaintiff returned to Dr. Myers and complained of depression and insomnia. (Tr. 19, 284). Dr. Myers placed her on Restoril for the insomnia and Celexa for depression. (Tr.19, 284). The Plaintiff reported difficulties with the Celexa and Dr. Myers changed the medication accordingly. The Plaintiff reported feeling anxious on Celexa and was switched to Elavil. (Tr. 19, 280). The Plaintiff could not tolerate Elavil and was placed back on Celexa. (Tr. 19, 280). The Plaintiff was also found to have anemia and Dr. Myers prescribed Procrit for treatment. (Tr. 280).

Contrary to the Plaintiff's argument, the ALJ did in fact discuss the treatment records of Dr. Myers. The Plaintiff states the ALJ merely referenced Dr. Myers in a short paragraph. (Tr. 362). However, the ALJ discussed the treatment records of Dr. Myers in his initial decision, which was not revised in its initial findings. Despite Plaintiff's claims to the contrary, the ALJ included Dr. Myers' opinion in the second decision as well. In his decision he states:

I wrote in my first decision that physical complaints were not this patient's primary

13

impediments to work, and the same applies to the different dates of the RCP. As I found previously, the applicant's hepatitis was not enough to rule out "light" duty in the past, and (relevant for this decision) in the mid-2000's. She did seem to have an enlarged liver in Dr. Berdick's office, but his was an unavoidably superficial clinical examination. Biopsy showed no worse than middling Class II disease. Dr. Santeiro, her general source, placed her on the hepatitis specific Peg Intron through at least July 2005 (about halfway through the claimed disability period), but enervating exhaustion was not identified [Exhibit 18F]. The stigmata of liver disease (clinical color, prominent vessels, fluid; laboratory enzymes, and slow clotting ) were not identified during this period, and she clearly was not marked for transplant. Hepatitis A and B were not reactive in mid-2004 [Exhibit 17F]. Ultrasound remained normal in March 2006, at last report, without any major curative intervention in the prior years. Dr. Myers did not cite specific limitations at that point, just over a month before RTW. Instead, he reported success with the PEG Intron, reducing the virus count without extreme side effects. [Exhibit 27F]. I again accord Ms. Burdette the benefit of every uncertainty and find that generalized enervation might have precluded the high threshold of "medium" duties, with their fifty pound lifting requirement (20 CFR 416.967(d)). Nevertheless, the only findings were subjective tenderness, not overwhelming fatigue that would have prevented sitting, standing, walking, pushing, pulling or lifting twenty pounds, as in "light " employment (20 CFR §416.967(c)).

(Tr. 362).

As clearly noted, the Plaintiff's biopsy showed middling disease Class II which was treated with Peg Intron therapy during the timeframe in question. The Plaintiff's impairment was not severe to the extent a transplant was necessary and a positive response occurred with therapy. The ALJ further cited to diagnostic testing which showed no major curative intervention when the Plaintiff returned to work. The medical record indicated the Plaintiff received treatment for the allegedly disabling impairments and Plaintiff was not assigned any specific limitations. While there is no dispute the Plaintiff suffered from Hepatitis and developed symptoms, the ALJ did not find where her treating physician classified her as disabled. To the contrary, Dr. Myers monitored Plaintiff's reaction to the therapy and noted success. The ALJ properly considered the opinions and findings of Dr. Myers as evidenced by limitations he imposed.

14

The Plaintiff also takes issue with the fact that the ALJ stated Dr. Santeiro initiated the PEG-Intron treatment when he is her psychiatrist. However, it appears to be a typographical error as the ALJ correctly cites to the medical records of Dr. Myers. The remainder of the ALJ's analysis would not change, and having cited to the correct records, the error is harmless. Clearly, the ALJ sufficiently stated his reasoning and cited to the opinion of Dr. Myers in support. The Plaintiff's argument, therefore, lacks merit.

### (a) Mental Health Professionals & Limitations

The Plaintiff argues the ALJ did not properly consider the Plaintiff's mental health records and erred not finding any mental limitations in her RFC. The Defendant argues the ALJ properly evaluated the medical records and the RFC was based upon substantial evidence.

In the ALJ's decision, the ALJ stated Dr. Jose Santeiro was the Plaintiff's treating psychiatrist. (Tr. 266, 328-329). The ALJ further noted the Plaintiff sought conventional medicine after using homeopathic remedies . (Tr. 363). On November 1, 2004, the Plaintiff was taking Xanax and Zoloft for depression and noted a 75 percent improvement. (Tr. 269). The Plaintiff was alert, oriented, pleasant, calm, cooperative, coherent with no psychosis or suicidal or homicidal thoughts. (Tr. 269). The Plaintiff received a GAP score of 70. (Tr. 269).

On January 25, 2005, the Plaintiff saw Dr. Santeiro complaining of depression and was being treated with Elavil. (Tr. 266). The Plaintiff complained Elavil was not working as she began the Interferon treatments which stopped her Zoloft prescription. (Tr. 266). Dr. Santeiro found the Plaintiff alert, oriented, pleasant, calm, cooperative, coherent and non-psychotic. (Tr. 266). Dr. Santeiro assessed the Plaintiff with a GAF score of 65, indicating mild to moderate mental limitations. (Tr. 266). The Plaintiff's anti-depressant therapy was also handled by her primary care

physician and Dr. Santeiro told the Plaintiff to decide where her medication was coming from. (Tr. 267).

In September 2005, Dr. Myers referred the Plaintiff for treatment for depressive effects during Interferon treatment. (Tr. 419). The Plaintiff sought treatment at the Ruth Cooper Center and was seen by Dr. Theodor Bonstedt. (Tr.419-420). The Plaintiff complained of gastroentestinal side effects from the medication Klonipin. (Tr. 419). Dr. Bonstedt found the Plaintiff to be over-tranquilized and her medications were changed as a result. (Tr. 420). The Plaintiff received a GAF score of 55 at this time. (Tr. 420). However, on September 28, 2005, the Plaintiff discontinued Interferon treatment and reported improvement with the current medication. (Tr. 421). She was then given a GAF score of 65. (Tr. 421).

Although the Plaintiff suggests the ALJ failed to properly consider the Plaintiff's mental health records, this argument fails. It is clear the ALJ extensively discussed the Plaintiff's mental health records in both the initial decision and the second decision. Having considered the records and opinion of the treating physicians, the ALJ found the Plaintiff capable of light and sedentary work with limitations. (Tr. 362). The Plaintiff claims disabling depression and/or anxiety, but the ALJ found the medical evidence did not support such a claim.

In support of his decision, the ALJ writes:

The Claimant's mentation during this period is often discussed, but I again cannot find that is precluded all work. She first allegedly had the informal acupuncture care outside of the organized medical system in 2002-3 which failed to produce any definite results [Exhibit 4F]. When she did re-enter conventional medicine in 2003, Dr. Santeiro termed her bright and not psychotic. At that time, he set the global assessment of functioning (GAF) at a rather sound 70 in autumn 2004, down just 5 points starting early in the following year, and at a still relatively stables 60 for spring 2006 (nearer her own decompensation date but also ironically closer to the time that she resumed work activity). She routinely saw the Ruth Cooper Center, but only as

an out-patient except four months before RTW. Her self-destructive effort in April 2006 seems to have been an isolated event, and was followed by no further psychological records in 2007 [Exhibit 17F]. She seemed to lack formal phobias, personality disorder or (to her credit) violence. There is no reason to question her blaming her former spouse for her divorce which discord does not seem to have translated into the workplace. She still did manage to raise three children (young and dependent in those days). She was not dismissed for altercations or fears. A follow-up assessment in 2008 was basically normal. I do not find sudden spontaneous recovery, salubrious event in her life, or new treatment that could justify her recovering the capacity to withstand the work pressures of marketing supervision and interpersonal contact in 2007, but not prior thereto. In other words, the job she selected was not a solitary, undemanding type of work that a woman with serious emotional dysfunction could be expected to commence when trying out the work force again. This factor suggests that she could have had the equanimity to return to the employment marketplace earlier, if possibly immediately not at her pressured current occupation. For the most part, the clinicians did not cite total psychiatric disability during the relevant time period. (Tr. 363).

Indeed, as the ALJ summarized, the medical records reflect a history of treatment for depression and anxiety. Although she was being treated for depression, the Plaintiff was taking anti-depressant medications and was given a GAF score that suggested only moderate limitations, which was accurately reflected. (Tr. 363).

Contrary to the Plaintiff's argument, the ALJ consistently noted the ongoing treatment from the Ruth Cooper Center. At no point was the Plaintiff diagnosed with disabling depression, and the ALJ gave the Plaintiff the benefit having found her limited to light work. Furthermore, the ALJ clearly considered the medical evidence and supported his reasoning. Thus, the Plaintiff's argument lacks merit.

### *Whether the ALJ Considered the Side Effects of the Plaintiff's Treatment*

_____The Plaintiff argues the ALJ failed to consider the side effects of fatigue, nausea and depression of the Plaintiff's Interferon therapy. The Regulations state that the burden is on the claimant to prove the severity of her impairments. 20 C.F.R. §§ 404.1512(a)(c); 416.912(a) and (c).

King vs. Astrue, 2008 WL 2817066, 4 (M.D. Ga.).

As noted above, the ALJ cited to the records of Dr. Myers which reflect the Plaintiff suffered from depression and anemia as a result of the Interferon. (Tr. 334). Dr. Myers treated the Plaintiff's anemia and fatigue with Procrit and stopped the Interferon therapy when she developed psychiatric side effects. (Tr. 362, 512 511). The ALJ again cited to Dr. Myers' records which indicated success with the PEG Intron therapy, reducing the virus count "without extreme side effects". (Tr. 362). The ALJ went further and found the generalized enervation precluded medium duties and found her capable of light employment. (Tr. 362). In addition, the ALJ credited the Plaintiff with the fact that she was raising three dependent children alone and acknowledged her intelligence in the workplace. The ALJ discussed the Plaintiff's effects from her illness and treatment, and he also addressed the manner in which they were resolved. The ALJ clearly addressed this issue and supported his reasoning for discounting the Plaintiff's claim.

### *Whether the ALJ Erred in the Plaintiff's Credibility Analysis and Failed to Apply the Eleventh Circuit Pain Standard*

The Plaintiff argues the ALJ improperly assessed Plaintiff's credibility regarding her subjective complaints of pain and her depression during the closed period of time and did not sufficiently support his reasoning. The Defendant argues the Plaintiff failed to meet her burden concerning her allegations about her impairments and the ALJ properly discounted those allegations and her credibility, in accordance with controlling Eleventh Circuit case law.

Pain is a non-exertional impairment. Phillips v. Barnhart, 357 F.3d 1232, 1243 n. 11 (11th Cir. 2004). Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g. medical signs and laboratory findings) showing the

existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423 (d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard." Foote, 67 F.3d at 1560.

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423 (d)(5)(A).

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Foote, 67 F.3d at 1561-62; Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. Hale v. Bowman, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. Foote, 67

F.3d at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

Here, in evaluating the Plaintiff's subjective symptomatology, the ALJ found the Plaintiff suffered from a medical condition that would produce symptoms, but Plaintiff's complaints of pain and limitations were not entirely credible.  (Tr. 364).  In his decision, the ALJ discussed in detail his reasoning for discounting the Plaintiff's allegations and purported functional limitations.  The ALJ thoroughly reviewed the medical records and also considered the Plaintiff's demeanor at the hearing.  The ALJ found it was plausible the Plaintiff's medically determinable impairments gave rise to the alleged symptoms.  However, he found Plaintiff's statements inconsistent with his RFC finding upon considering the intensity, persistence and limiting effects of the Plaintiff's symptoms.  In his decision, the ALJ states, in support his assessment of the Plaintiff's credibility:

> The applicant described regurgitation side effects from Klonopin, and possibly Restoril, but was able to change the offending medications.  She has been inconsistent in regard to a number of factors, including the origin of her hepatitis. She claimed a transfusion effect, but clinicians suspected that cocaine and/or alcohol played a role [e.g. Exhibit 22F].  She has little knee damage to explain her complaints in that area.  Finding in that interval (as now) tended to be more subjective than objective.  She admitted to periods of remission, when speaking to doctors if not at the hearing.  For example, she denied radiculopathy symptoms, so the orthopedist did not see the need for magnetic resonance imaging in later 2006 [Exhibit 25F].  Some

physicians noted discrepancies, in that she appeared in no acute distress in 2006, and the therapist contradicted her claims of poor ambulation by stating that "the medications are working quite well" [Exhibit 25F, p. 9]. The claimant did not appear in gross medical/physical stress at the first hearing, insofar as lay observation could indicate. She did not present supportive testimony at the hearing from lay witnesses. She did not always cooperate with treatment, with suggestions of non-compliance in treatment during this interval [Exhibit 17F]. She declined a proffered injection treatment in 2006, suggesting that her joint pains were not that extreme [Exhibit 25F, p. 9]. Although this was after RTW, there was no earlier intensive treatment during the RCP. She has not had epidural blocks, morphine pump or formal pain management. (20 C.F.R. 416.930). In fact, there were no treatment records in 2007. At home, she did some chores and driving consistent with light work (ambulation, use of the arms), since she was raising several dependent children. The part-time work and current employment suggests motivation, but also indicates a capacity to have done the work full-time previously. She also was not initially forthcoming about this additional employment. Based on the totality of these combined discrepancies, the claimant's veracity is not fully established, and should not have precluded the physical/mental exertion described above, even if she should have avoided medium duties, based on symptoms alone. (Tr. 364-365).

First, the Plaintiff initially takes issue with the ALJ's finding of "Alcoholic Hepatitis". (Tr. 364). The ALJ states that the finding was made based upon inconsistencies as to the origin of her hepatitis. (Tr. 364). In support of his statement, the ALJ refers to "Exhibit 22F", which appears to be records from the Ruth Cooper Center. (Tr. 419-456). Upon review, the medical records do not appear to attribute Plaintiff's Hepatitis C to alcoholism. In Exhibit 22F, there is an "Alcohol and Drug Use" survey taken at Ruth Cooper which reflects Plaintiff's previous use of Cocaine "in the 1980's", and having used marijuana and alcohol previously. (Tr. 438). However, at no point does it state this may have been the catalyst to Plaintiff's Hepatitis diagnosis. The Plaintiff reported and the medical records state the origin of the Hepatitis was as a result of transfusions in 1977 and 1985 from excessive bleeding from ovarian/uterine cysts. (Tr. 431). The Court notes the records indicating Plaintiff's past drug use, however, at no point did physicians state that drug use contributed to

Plaintiff's liver problems. While the Court does not find the statement or finding appropriate, it is harmless error. As explained below, it does not alter the ALJ's additional findings or the ultimate determination, but was merely used as a factor in assessing Plaintiff's credibility.

The ALJ went into several other reasons as to why Plaintiff's claims were less credible during the closed period. Plaintiff complained of knee pain and abnormal gait, but the Plaintiff was noted to be improving. (Tr. 364, 499). As the ALJ noted, despite claims of disabling pain, Plaintiff refused injection therapies to treat the specific areas of pain and was benefitting from the medication. (Tr. 364, 499). This is not indicative of an individual suffering with disabling pain. The ALJ also pointed out Plaintiff did not receive intensive treatment, or formal pain management. (Tr. 364). The closed date of disability ends in March of 2007, but the ALJ pointed out the record was devoid of treatment records for 2007. (Tr. 365). While it is true that pain can be disabling, an individual's statement as to pain is not itself conclusive of disability. 42 U.S.C. § 423 (d)(5)(A); Marbury vs. Sullivan, 957 F.2d 837, 839. Clearly, while the Plaintiff experienced pain during the closed period, the objective medical evidence does not support a finding that is was disabling.

Furthermore, the ALJ conducted two hearings and noted the Plaintiff's demeanor to be absent of any mental/physical stress during the first hearing. (Tr. 364). During this time, the Plaintiff was capable of household chores, driving and independently raising several dependent children. (Tr. 364-365). Plaintiff's daily activities were inconsistent with complaints of disabling pain. See Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002) (upholding the ALJ's finding that the claimant's allegations of disabling pain were not credible because of her daily activities demonstrated otherwise). Therefore, the Court finds that the ALJ clearly articulated why the Plaintiff's subjective allegations of pain did not rise to the level of being disabling.

Lastly, the Plaintiff argues that the ALJ did not assess the Plaintiff's credibility in accord with the Social Security Ruling 96-7(p). However, the ALJ's credibility determination does not need to cite particular phrases or formulations from case law or the Social Security Rulings. Dyer v. Barnhart, 395 F.3d 1206, 1210-1211 (11th Cir. 2005)(citing Foote, 67 F.3d at 1561)). As such, the ALJ did not err in his credibility analysis and properly applied the Holt pain standard. Clearly, the ALJ supported his determination with substantial evidence and where the Commissioner's decision is supported by substantial evidence, the District Court will affirm. Edwards, 937 F.2d at 585 n.3.

Accordingly it is hereby

**RESPECTFULLY RECOMMENDED:**

The Decision of the Commissioner should be **AFFIRMED**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RESPECTFULLY RECOMMENDED** at Fort Myers, Florida, this __5th__ day of March, 2010.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: Counsel of record